**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SBS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-6557 |
| | ) | |
| DENNIS POTTS and WOODLAND | ) | Demand for Jury Trial |
| INTERNATIONAL TRANSPORT | ) | |
| COMPANY, INC., d/b/a | ) | |
| WOODLAND GLOBAL, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff SBS Worldwide, Inc. ("SBS" or "Company" or "Plaintiff") files this Complaint against Defendants Dennis Potts ("Potts") and Woodland International Transport Company, Inc. d/b/a Woodland Global ("Woodland Global," and collectively, "Defendants") and states on knowledge, information, and belief, as follows:

## PARTIES

1.      SBS is a shipping company incorporated in the State of Delaware with its principal place of business in Atlanta, Georgia.

**ANSWER:**


2.      Potts is a citizen of the State of Illinois, residing at 312 River Glen, Elmhurst, Illinois 60126.

**ANSWER:**

3.     Woodland Global is incorporated in and doing business in the State of Illinois.  Its principal place of business is in Essex, England.  Woodland Global's registered agent is Illinois Corporation Services Co., 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

**ANSWER:**


## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

**ANSWER:**


5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367, as Plaintiff alleges claims under federal law, namely the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g).

**ANSWER:**


6.     This Court has personal jurisdiction over Defendants.

**ANSWER:**


7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**ANSWER:**


## BACKGROUND AND RELEVANT FACTS

8.     SBS is a multi-national logistics company offering numerous services including air freight, ocean freight, road freight, customs brokerage, courier service, supply chain solutions, and supply chain software.

**ANSWER:**

1006404.1

9.     SBS considers certain items to be confidential and in the nature of trade secrets, including but not limited to customer lists, customer preferences, services used by its customers, prices charged to customers, profit margins, sales data, specific information regarding customer relationships, and other financial information (collectively, "confidential customer information").

**ANSWER:**

10.     SBS deems its customer information confidential because it operates in a competitive environment.

**ANSWER:**

11.     SBS derives significant economic value from its confidential customer information, which is not generally known either to the public or within SBS' industry, and which also would provide economic value to SBS' competitors.

**ANSWER:**

12.     SBS seeks to maintain the secrecy of its confidential customer information because the fewer competitors who know its customers and call on them, the better position SBS is in to make sales.

**ANSWER:**

13.     Similarly, because competitors often do not know which services a customer buys or uses or the pricing and other terms of those services, SBS seeks to maintain the confidentiality of that information.

**ANSWER:**

1006404.1

14.    SBS also seeks to keep pricing and profit margin information confidential to keep competitors from underbidding it, and because SBS prioritizes its largest customers and negotiates pricing based in part upon volume.

**ANSWER:**


15.    Among other steps to keep its customer information confidential, SBS utilizes a password-protected intranet, utilizes security cameras, locks its offices and warehouse, and restricts access to customer data to those people who have a need to know certain information to do their jobs.

**ANSWER:**


16.    At all relevant times, SBS maintained a Non-Disclosure policy that was distributed to all employees, including Potts, and informed employees that the protection of confidential business information and trade secrets is vital to the interests and success of SBS.

**ANSWER:**


17.    The SBS Non-Disclosure policy states that employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment, even if they do not actually benefit from the disclosed information.

**ANSWER:**


18.    At all relevant times, SBS also maintained a policy requiring immediate return of Company property upon request or upon termination of employment.

**ANSWER:**


19.    Beginning in May 1998, SBS employed Potts in its Elmhurst, Illinois office. Potts worked in operations and became General Manager of the Elmhurst office in 2007.

**ANSWER:**

20.     Potts acknowledged that he received and understood that SBS policy prohibited all employees from removing any company files, documents, or information from the SBS office.

**ANSWER:**


21.     As the General Manager, Potts was responsible for, among other things, ensuring that employees in the Elmhurst, Illinois office complied with all Company policies, including policies regarding the confidentiality of Company files, documents, and information.

**ANSWER:**


22.     In his role as a General Manager, Potts was provided access to confidential customer information.

**ANSWER:**


23.     In April 2011, Potts was demoted from the General Manager role to a Business Development Executive position.

**ANSWER:**


24.     As a Business Development Executive, Potts was highly compensated, with a base salary of $130,000, a car allowance, significant commission payments, and other benefits and compensation.

**ANSWER:**


25.     As a Business Development Executive, Potts' job duties included developing new prospects and interacting with existing customers to increase sales of the Company's products and services.  To that end, Business Development Executives were expected to undertake a minimum of forty (40) sales calls per month and complete a minimum of twenty (20) sales proposals per month.

**ANSWER:**

5

26.     In his role as a Business Development Executive, Potts was provided access to confidential customer information.

**ANSWER:**


27.     In April 2011, Potts acknowledged his receipt and understanding of all SBS policies and procedures.

**ANSWER:**


28.     Beginning no later than January 2011, unbeknownst to SBS, Potts began forwarding confidential customer information to his personal email account.

**ANSWER:**


29.     Potts had no legitimate business reason to forward confidential customer information to his personal email account, and was prohibited by Company policy from doing so.

**ANSWER:**


30.     In the Spring of 2013, in a further effort to protect its confidential customer information, SBS approached certain sales executives, including Potts, and sought to enter into employment agreements including reasonable restrictive covenants.

**ANSWER:**


31.     Potts, who already had been forwarding confidential customer information to his personal email account in anticipation of unlawfully competing with SBS, retained counsel and refused to enter into any employment agreement that would subject him to restrictive covenants.

**ANSWER:**

1006404.1

32.     In anticipation of his resignation, Potts sought to ingratiate himself with SBS customers who he planned to solicit after his resignation, including by intentionally quoting shipping prices to SBS customers that Potts knew would incur substantial losses to SBS.  Potts also knew that SBS would not discover his intentional mispricing of services until after he resigned from SBS, and Potts knew that any attempt by SBS to remedy his intentional mispricing could cause SBS a loss of goodwill with its customers.

**ANSWER:**


33.     Also in anticipation of his resignation, Potts surreptitiously entered SBS's offices on Saturday, June 15, 2013, and removed a substantial number of Company files from the office, in violation of Company policy.

**ANSWER:**


34.     The files taken by Potts included personnel files for numerous SBS officers and employees, including other sales executives.  Those documents contain confidential information.

**ANSWER:**


35.     The files taken by Potts included documents from management meetings, copies of emails, and salary information for other employees.  Those documents contain confidential information.

**ANSWER:**


36.     The files taken by Potts included multiple years of Commission Reports, including such confidential customer information as customer quotes and contact details, email exchanges with customers, proposals sent to customers, and Profit Reports with details of shipments, revenues, costs, and profit margins.

**ANSWER:**

1006404.1

37.     Potts had no legitimate business reason to take files including confidential customer information from the Company's premises, and was prohibited by Company policy from doing so.

**ANSWER:**


38.     Potts' actions in taking the files were recorded by SBS' security cameras and later reviewed by SBS management when Potts' plan to misappropriate SBS' confidential customer information became known.

**ANSWER:**


39.     Potts continued forwarding SBS' confidential customer information to his personal email account until the final days of his employment.

**ANSWER:**


40.     In an effort to conceal his theft of confidential customer information, Potts intentionally deleted from his SBS email account the emails he had forwarded to his personal email account.

**ANSWER:**


41.     Potts resigned from SBS on July 2, 2013, and his last day of work was July 3, 2013.

**ANSWER:**


42.     Immediately after resigning from SBS, Potts began working for an SBS competitor, Defendant Woodland Global, as a Sales Executive.

**ANSWER:**

1006404.1

43.     As a Sales Executive for Woodland Global, Potts is employed in a substantially similar position to the Business Development Executive position he held with SBS.

**ANSWER:**


44.     Upon information and belief, Potts represented to Woodland Global that he could and would use his knowledge of SBS' confidential customer information to solicit SBS customers on behalf of Woodland Global.

**ANSWER:**


45.     Using SBS's confidential customer information, Potts began soliciting SBS customers on behalf of Woodland Global in July 2013.

**ANSWER:**


46.     For example, Potts sent a proposal on behalf of Woodland Global to an SBS customer, Posterservice, Inc.  Because SBS and Woodland Global have different pricing structures, Potts requested that Posterservice provide him with additional information so that he could underbid SBS based on his knowledge and/or possession of the SBS charge codes and other confidential information.

**ANSWER:**


47.     Upon learning of Potts' actions, SBS incurred costs, including damage assessment and mitigation.

**ANSWER:**


48.     Upon learning of Potts' actions, SBS sent a cease and desist letter to Potts via email and overnight delivery on July 17, 2013, putting Potts on notice regarding his violations of law and misappropriation of the Company's confidential customer information.

**ANSWER:**

9

49.     The cease and desist letter directed Potts to stop using the confidential information and documents that he took from SBS, return all electronic and other information, and to describe the circumstances regarding his use and disclosures of the Company's confidential customer information.

**<u>ANSWER:</u>**


50.     In response to the cease and desist letter, Potts forwarded to SBS's counsel hundreds of emails that he had sent from his SBS email account to his personal email account.

**<u>ANSWER:</u>**


51.     The emails that Potts returned to SBS conclusively establish that Potts misappropriated confidential customer information from SBS during his employment.

**<u>ANSWER:</u>**


52.     Although Potts claimed he returned to SBS all of the emails that he forwarded to his personal account, he did not do so.

**<u>ANSWER:</u>**


53.     Also in response to the cease and desist letter, Potts returned to SBS four boxes full of documents that he had taken from SBS including confidential customer information.

**<u>ANSWER:</u>**


54.     Upon information and belief, Potts has retained confidential customer information, notwithstanding his return of some of SBS' emails and documents.

**<u>ANSWER:</u>**

1006404.1

55.     Potts has used and is continuing to use SBS' confidential customer information in his attempts to solicit SBS customers.

**ANSWER:**


56.     Potts' employment by Woodland Global necessarily creates the likelihood of the inevitable disclosure of SBS' confidential customer information. Potts cannot help but employ, in his new capacity as a Sales Executive for Woodland Global's products and services which directly compete with SBS' products and services, his knowledge of SBS' confidential customer information. Even were Potts to agree not to disclose any of this information, such agreement would be completely ineffective, because the confidential information acquired by Potts during his employment by SBS is exactly the type of information that any salesperson needs and must use to effectively compete for customers against SBS and on behalf of a competitor such as Woodland Global.

**ANSWER:**


57.     By and through his unlawful use of SBS' confidential customer information in the two months immediately following the termination of his employment with SBS, Potts has enticed multiple SBS shippers and clients to Woodland Global. The SBS customers enticed to leave SBS by Potts' unlawful use of SBS' confidential customer information collectively represent revenue in excess of one million dollars during 2013.

**ANSWER:**


58.     SBS put Woodland Global on notice of Potts' conduct, including his taking of SBS' confidential customer information and his use of same for purposes of unfairly competing with SBS on behalf of Woodland Global.

**ANSWER:**


59.     Woodland Global has used and is continuing to use SBS' confidential customer information in order to gain an unfair competitive advantage.

**ANSWER:**

11

60.     Woodland Global has aided, abetted, and ratified Potts' conduct.

**ANSWER:**


61.     Woodland Global's employment of Potts further threatens to, and will inevitably result in, the disclosure of SBS' confidential information. As a former SBS General Manager and Business Development Executive, virtually all of SBS' confidential information will assist Potts in targeting new customers for Woodland Global. Potts can utilize his knowledge of SBS' confidential customer information to undercut SBS and to claim to potential customers that Woodland Global's products and services will be superior to SBS' based on his intimate familiarity with SBS' confidential information. Since all of this information is the type of information upon which salespersons customarily rely to convince prospective customers of the superiority of their products and services, Potts' attempt to make sales for Woodland Global will inevitably result in the disclosure of SBS' confidential information.

**ANSWER:**


## COUNT I:  ILLINOIS TRADE SECRETS ACT

62.     SBS incorporates paragraphs 1 through 61 as if fully set forth herein.

**ANSWER:**


63.     Through his employment with SBS, Potts had access to and knowledge of confidential customer information and trade secrets of SBS.

**ANSWER:**


64.     SBS derives economic value and competitive advantage from the fact that its confidential customer information is not known to its competitors, who could also derive economic value from its disclosure or use. Because of the value of this information, SBS has undertaken reasonable measures to maintain its secrecy.

**ANSWER:**

1006404.1

65.     SBS' confidential customer information constitutes "trade secrets" as defined by the Illinois Trade Secrets Act, 765 ILCS 1065/2, as well as under Illinois common law.

**ANSWER:**


66.     Potts and Woodland Global misappropriated SBS' trade secrets and used and/or disclosed that information to gain unfair competitive advantage.  Defendants' actions constitute willful, malicious, and/or reckless violations and threatened violations of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*.

**ANSWER:**


67.     As a result of Defendants' misappropriation of SBS' trade secrets, SBS has suffered damages in an amount to be determined at trial, including exemplary damages pursuant to 765 ILCS 1065/4(b).

**ANSWER:**


68.     As a result of Defendants' intentional and wrongful conduct, SBS has been injured, for which it is entitled to preliminary and permanent injunctive relief and monetary damages against Potts and Woodland Global together with punitive damages, attorneys' fees, and costs in an amount to be determined by a jury at trial.

**ANSWER:**


**COUNT II:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

69.     SBS incorporates paragraphs 1 through 61 as if fully set forth herein.

**ANSWER:**


70.     SBS has existing business relationships with its customers and prospective customers.

**ANSWER:**

13

71. Potts and Woodland Global are aware of SBS' business relationships and the identities of its customers and prospective customers.

**ANSWER:**


72. By their actions, Defendants have knowingly and intentionally interfered with SBS' business relationships with multiple customers of SBS using improper means and improper motives in an attempt to cause those relationships to terminate, in violation of Illinois law.

**ANSWER:**


73. SBS has been damaged as a result of Defendants' interference with its business relationships, including but not limited to lost profits and loss of goodwill, for which SBS is entitled to recover actual and punitive damages.

**ANSWER:**


## COUNT III: UNFAIR COMPETITION

74. SBS incorporates paragraphs 1 through 61 as if fully set forth herein.

**ANSWER:**


75. By their actions, Potts and Woodland Global have engaged in unfair competition in violation of Illinois law by engaging in tortious conduct that has deprived SBS of customers and of particular sales to its customers and prospective customers.

**ANSWER:**

1006404.1

76.     As a direct and proximate result of unfair competition in which Defendants have engaged in violation of Illinois law, SBS has suffered and will continue to suffer severe and irreparable harm, for which SBS is entitled to injunctive relief, as well as damages to help SBS recover as much of its economic injuries as can be calculated.

**ANSWER:**


## COUNT IV:  COMPUTER FRAUD AND ABUSE ACT
### (Against Dennis Potts)

77.     SBS incorporates paragraphs 1 through 61 as if fully set forth herein.

**ANSWER:**


78.     By accessing SBS' computers, intranet, and email system with intent to make improper use of the confidential customer information he obtained, Potts' conduct violated 18 U.S.C. § 1030(a)(2)(C) and (a)(4).

**ANSWER:**


79.     Potts' conduct caused a loss to SBS of at least $5,000.00, including costs related to damage assessment and mitigation.

**ANSWER:**


80.     SBS is entitled to recover its economic damages pursuant to 18 U.S.C. 1030(g).

**ANSWER:**


## COUNT V:  BREACH OF DUTY OF LOYALTY
### (Against Dennis Potts)

81.     SBS incorporates paragraphs 1 through 61 as if fully set forth herein.

**ANSWER:**

1006404.1

82.     In the course and scope of his employment, SBS entrusted Potts with its confidential customer information.

**<u>ANSWER:</u>**


83.     Potts owed and continues to owe SBS a duty of loyalty to refrain from using or disclosing SBS' confidential customer information.

**<u>ANSWER:</u>**


84.     Potts breached his duty of loyalty to SBS during his employment by taking SBS' confidential customer information.

**<u>ANSWER:</u>**


85.     Since the termination of his employment, Potts has breached his duty of loyalty to SBS by wrongfully using and disclosing SBS' confidential customer information.

**<u>ANSWER:</u>**


86.     Potts' conduct has undermined SBS' ability to conduct its business.

**<u>ANSWER:</u>**


87.     As a result of Potts' breach of his duty of loyalty, SBS has suffered damages in an amount to be determined at trial.

**<u>ANSWER:</u>**

1006404.1

## COUNT VI: UNJUST ENRICHMENT

88.     SBS incorporates paragraphs 1 through 61 as if fully set forth herein.

**ANSWER:**


89.     Defendants have been enriched as a result of using SBS' trade secrets and confidential customer information.

**ANSWER:**


90.     There is no justification for permitting Defendants to unjustly enrich themselves at SBS' expense.

**ANSWER:**


91.     Equity demands that Defendants not be permitted to unjustly enrichment themselves.

**ANSWER:**


**WHEREFORE,** Plaintiff SBS Worldwide, Inc. prays that the Court:

a.      Issue a restraining order, temporary and permanent injunction that enjoins Woodland Global from employing Potts in any role substantially similar to his General Manager or Business Development Executive roles with SBS, and enjoining Potts from having any further personal, verbal, or written contact with any client or customer of SBS with whom Potts had contact during his employment with SBS;

b.      Order Potts to provide a list of all customers of SBS, including any employees, agents, or representatives of such customers, with whom Potts has had any contact since his employment with SBS ended, including (i) a description of the date, time, nature, and substance of each contact; and (ii) the name of the person or persons with whom each contact occurred. Potts should also be ordered to provide a description of any information about SBS that Potts has shared with anyone since his employment with SBS ended, as well as the gross dollar value of all orders placed with Woodland

1006404.1

Global by any person or entity with whom Potts shared information about SBS;

c.       Enter judgment in favor of Plaintiff against Potts and Woodland Global on its claims for misappropriation of trade secrets, tortious interference with business relations, unfair competition, and unjust enrichment, and against Potts on Plaintiff's claims for violation of the Computer Fraud and Abuse Act and for breach of duty of loyalty;

d.       Grant to Plaintiff actual, treble, compensatory, and consequential damages;

e.       Order Defendants to pay Plaintiff's attorneys' fees and expenses incurred in pursuing this lawsuit; and

f.       Award any and all other relief to Plaintiff that this Court may deem necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury as to all claims brought in this action.

Respectfully submitted,

SBS WORLDWIDE, INC.

By:  s/Edward N. Druck
            Edward N. Druck


Edward N. Druck
end@franczek.com
Franczek Radelet P.C.
300 South Wacker Drive
Suite 3400
Chicago, Illinois 60606
(312) 986-0300 phone
(312) 986-9192 fax

Theresia M. Moser
   (*Pro Hac Vice* Application to be filed)
   tmoser@mmlfirm.com
Charles E. Solley
   (*Pro Hac Vice* Application to be filed)
   tsolley@mmlfirm.com
Meyer Moser Lang LLP

18

Southern Dairies Building
621 North Ave., N.E.
Suite C-150
Atlanta, Georgia 30308
(404) 537-5330 phone
(404) 537-5340 fax

Attorneys for Plaintiff

Dated:  September 13, 2013

1006404.1