IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SBS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 13 C 6557 |
| DENNIS POTTS and WOODLAND | ) | |
| INTERNATIONAL TRANSPORT | ) | |
| COMPANY, INC., d/b/a WOODLAND | ) | |
| GLOBAL | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On September 13, 2013, plaintiff SBS Worldwide, Inc. ("SBS") filed a complaint

("Complaint") (Dkt. No. 1 ("Compl.")) against former SBS employee Dennis Potts ("Potts") and

Potts's new employer, Woodland International Transport Company, Inc., doing business as

Woodland Global ("Woodland") (collectively "Defendants"). SBS seeks injunctive and other

relief from Potts and Woodland for alleged violations of the Illinois Trade Secrets Act ("ITSA"),

765 ILCS 1065/2-3, tortious interference with business relationships, unfair competition, and

unjust enrichment. (Compl. ¶¶ 62-75, 88-91.) SBS also seeks monetary relief from Potts for

breach of fiduciary duty and alleged violations of the Computer Fraud and Abuse Act ("CFAA"),

18 U.S.C. § 1030, *et seq*. (Compl. ¶¶ 77-87.) Woodland has moved to dismiss (Dkt. No. 12) the

four counts alleged against Woodland (Counts I-III, VI), pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Potts has moved

to dismiss (Dkt. No. 17) all six counts of SBS's Complaint for the same reason. In its response to

Defendants' motions to dismiss (Dkt. No. 22 ("Pl.'s Resp.")), SBS asks this court to impose

sanctions on Potts and Woodland. (*Id.* at 1-2, 8-10.) For the reasons detailed below, Defendants' motions to dismiss are granted in part and denied in part, and SBS's motion for sanctions is denied.

## FACTUAL BACKGROUND

At this stage in the litigation, the court must accept the factual allegations in SBS's Complaint as true and must draw all reasonable inferences in SBS's favor. *Fednav Int'l Ltd.* v. *Cont'l Ins. Co.*, 624 F.3d 834, 837 (7th Cir. 2010). The facts set forth below are therefore stated from that perspective.

SBS is a global logistics company specializing in international freight and supply chain solutions. (Compl. ¶ 8.) In the course of business, SBS compiles certain confidential information not publicly available regarding its customers. (*Id.* ¶ 11.) That information includes the customers' identities, preferences, services, purchasing history, and "specific information regarding customer relationships." (*Id.* ¶ 9.) SBS also compiles confidential sales data, including the prices SBS charges its customers and the profit margins SBS earns on its sales. (*Id.*) SBS alleges it derives significant economic value from this "confidential customer information" because "the fewer competitors who know its customers and call on them, the better position SBS is in to make sales." (*Id.* ¶ 12.) SBS similarly keeps its price and margin information confidential to prevent competitors from underbidding SBS. (*Id.* ¶ 14.) Ultimately, according to the Complaint, SBS's confidential customer information is "the type of information that any sales person needs and must use to effectively compete for customers against SBS." (*Id.* ¶ 56.)

SBS recognizes its proprietary interest in its confidential information by requiring employees to keep the information confidential, restricting its access to selective employees, and

2

utilizing security measures such as passwords. (Compl. ¶ 14.) SBS also requires employees to abide by a non-disclosure policy barring employees from misusing trade secrets and other confidential business information. (*Id.* ¶ 17.) In the spring of 2013, SBS added an additional layer of protection by asking certain sales executives, including Potts, to enter into employment agreements containing restrictive covenants. (*Id.* ¶ 30.) Potts, however, declined to enter into any employment agreement with SBS. (*Id.* ¶ 31.)

Potts began his employment at SBS in May of 1998, and prior to his resignation held the position of Business Development Executive. (Compl. ¶¶ 19, 23.) In this role he was responsible for finding new customers and interacting with existing customers to increase sales of SBS's products and services. (*Id.* ¶ 25.) Between 2007 and April of 2011, before Potts was demoted to Business Development Executive, he held the position of General Manager of SBS's Elmhurst office. (*Id.* ¶¶ 19, 21, 23.) In that role, he was responsible for, among other things, ensuring that employees complied with SBS's company policies. (*Id.* ¶ 21.)

Beginning in January of 2011, Potts began forwarding emails containing SBS's confidential customer information to his personal email account, in violation of SBS's company policy, and continued to do so until his resignation on July 2, 2013. (Compl. ¶¶ 28, 39.) Before he left, Potts attempted to delete the forwarded emails from his SBS email account. (*Id.* ¶ 40.) On Saturday, June 15, 2013, Potts entered SBS's offices and removed a number of SBS files. (*Id.* ¶ 33.) These files contained documents from management meetings, copies of emails, employee salary information, employee commission reports, and SBS profit reports. (*Id.* ¶¶ 34-36.) The commission reports contained customer contact details, price quotes, and email exchanges with

customers. (*Id.* ¶ 36.) The profit reports contained details of shipments, revenues, costs, and profit margins. (*Id.*) Finally, in anticipation of resigning from SBS, Potts quoted shipping prices to SBS customers that he knew would result in losses to SBS. (*Id.* ¶ 32.) Potts resigned from SBS on July 2, 2013 and his last day of work was July 3, 2013. (*Id.* ¶ 41.)

After his resignation, Potts began working for Woodland, which competes with SBS to provide international freight and supply chain solutions. (Compl. ¶ 42.) SBS alleges Potts promised Woodland he would use his knowledge of SBS's confidential customer information to solicit SBS clients on behalf of Woodland. (*Id.* ¶ 44.) In July of 2013, Potts fulfilled his promise and solicited business from SBS customer Posterservice, Inc. ("Posterservice"). (*Id.* ¶ 46.) As part of his proposal to Posterservice, Potts asked Posterservice to provide him with "additional information" so that he could underbid SBS based on his knowledge and possession of SBS's charge codes. (*Id.*) SBS claims that because SBS and Woodland use different pricing structures, these charge codes were necessary for Potts to offer Posterservice a better price than SBS. (*Id.*)

Upon learning that Potts was soliciting business from SBS customers, SBS sent Potts a "cease and desist" letter on July 17, 2013. (Compl. ¶ 48.) The letter directed Potts to stop using the confidential information and documents he took from SBS, return all electronic and other information, and to describe the circumstances of his use and disclosure of SBS's confidential customer information. (*Id.* ¶ 49.) SBS also informed Woodland that Potts was using SBS's confidential customer information to compete "unfairly" on Woodland's behalf. (*Id.* ¶ 58.) In response, Potts forwarded to SBS's counsel "hundreds of emails" he had sent from his SBS email account to his personal email account, and returned to SBS four boxes of documents he

had taken from SBS's offices. (*Id.* ¶¶ 50, 53.) SBS alleges the returned emails and documents contained SBS's confidential customer information, (*id.* ¶¶ 51, 53), and that Potts has retained certain confidential customer information by failing to return all of the emails he forwarded to his personal account between January of 2011 and July 3, 2013 (*id.* ¶¶ 52, 54).

Despite returning certain emails and documents, Potts has continued to solicit business from SBS customers using SBS's confidential customer information. (*Id.* ¶ 55.) Since his resignation, Potts has convinced multiple SBS customers to do business with Woodland instead of SBS. (*Id.* ¶ 57.) SBS estimates these former customers accounted for over one million dollars in revenue during 2013. (*Id.*)

On September 13, 2013, SBS filed this lawsuit against Potts and Woodland. SBS's Complaint asserts the following four counts against Potts and Woodland: violation of the ITSA (Count I); tortious interference with business relationships (Count II), unfair competition (Count III), and unjust enrichment (Count VI). (Compl. ¶¶ 62-76, 88-91.) SBS's Complaint asserts two additional counts against Potts: violation of the CFAA (Count IV) and breach of duty of loyalty (Count V). (Compl. ¶¶ 77-87.) SBS seeks monetary relief and an injunction barring Woodland from employing Potts in any role substantially similar to his General Manager or Business Development Executive roles with SBS, and enjoining Potts from having any further contact with any client or customer of SBS with whom Potts had contact during his employment with SBS. Defendants moved to dismiss all counts alleged in SBS's Complaint pursuant to Rule 12(b)(6). (Dkt. Nos. 12, 17.) On November 12, 2013, in its response to the motions to dismiss, SBS requested that this court impose sanctions on Potts and Woodland for purportedly

mischaracterizing SBS's Complaint and misleading this court on the law applicable to SBS's claims. (Pl.'s Resp. at 1-2, 8-10.)

<u>LEGAL STANDARD</u>

Under the Federal Rules of Civil Procedure, a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. The complaint must "include sufficient facts 'to state a claim for relief that is plausible on its face.'" *Cole* v. *Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011) (quoting *Justice* v. *Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a Rule 12(b)(6) motion, the court "construe[s] the . . . [c]omplaint in the light most favorable to Plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in his favor." *Cole*, 634 F.3d at 903.

<u>ANALYSIS</u>

I.    <u>Violation of the Illinois Trade Secrets Act (Count I)</u>

Count I alleges trade secret misappropriation in violation of the ITSA, 765 ILCS 1065/2-3. To state a claim under the ITSA, a plaintiff must sufficiently allege (1) the existence of a trade secret and (2) misappropriation of that trade secret. *PepsiCo* v. *Redmond*, 54 F.3d 1262,

1268 (7th Cir. 1995); *see also Liebert Corp.* v. *Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 1st Dist. 2005). The ITSA defines a trade secret as information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Examples of information that often fulfills the ITSA's secrecy requirement include "customer lists that are not readily ascertainable; pricing, distribution, and marketing plans; and sales data and market analysis information." *Mintel Intern. Group, Ltd.* v. *Neerghen*, No. 08 C 3939, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010) (Dow, J.) (citations omitted).

Defendants contend that SBS fails to plead the elements of its ITSA claim. Defendants argue SBS does not sufficiently allege the existence of a trade secret because its Complaint fails to identify facts showing that SBS's confidential customer information is actually secret or that SBS took reasonable steps to keep its information confidential. (Dkt. No. 14 ("Woodland Mem.") at 6-7; Dkt. No. 17 ("Potts Mem.") at 8-10.) Defendants also argue SBS fails to allege any misappropriation of its alleged trade secrets. (Woodland Mem. at 8-9; Potts Mem. at 10-11.)

A.  Existence of a Trade Secret

Although Defendants do not contest that SBS derives economic value from its confidential customer information, they contend Count I fails because the Complaint does not contain plausible facts showing that the identities of SBS's customers or the prices SBS quotes to its customers are actually secret. (Woodland Mem. at 6; Potts Mem. at 8-9.) In the alternative,

Woodland claims SBS has not alleged facts showing it took reasonable efforts to maintain the secrecy of its customers or the prices they pay. (Woodland Mem. at 7.)

*i. Secrecy*

Defendants contend the allegations contained in SBS's Complaint undermine any claims of secrecy. Defendants argue that paragraph 12 of the Complaint, which states that "the fewer competitors who know [SBS's] customers . . . the better," implies that at least *some* competitors know the identities of SBS's customers. (Woodland Mem. at 6; Potts Mem. at 9.) Similarly, Defendants argue the allegations in the Complaint show that SBS, like most businesses, discloses its prices to its customers. (Woodland Mem. at 6-7; Potts Mem. at 9-10; *see also* Compl. ¶ 46.) Consequently, Defendants argue SBS's customers and prices cannot form the basis of a claim under the ITSA because they are not secret.

As an initial matter, SBS's alleged trade secrets include more than merely the identities of its customers and the prices those customers pay. SBS alleges trade secrets in its "confidential customer information," which includes "customer lists, customer preferences, services used by its customers, prices charged to customers, profit margins, sales data, specific information regarding customer relationships, and other financial information." (Compl. ¶ 9.) These categories of information, if not readily ascertainable from a public source but instead developed with a substantial amount of time, effort, and money, may be secrets under the ITSA. *See, e.g.*, *Mintel Intern. Grp. Ltd.*, 2010 WL 145786, at *11 (citing *Stampede Tool Warehouse, Inc.* v. *May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1st Dist. 1995)). Here, SBS alleges its confidential customer information is not known to its competitors or the public and that SBS derives

significant value from the alleged confidentiality. (Compl. ¶¶ 11, 64.) In ruling on a 12(b)(6) motion, the court must accept as true SBS's allegation that its confidential customer information is actually secret. *See, e.g., Cole*, 634 F.3d at 903.

Defendants' contention that the Complaint undermines SBS's claims of secrecy is unconvincing. The Complaint's assertion that "the fewer competitors who know [SBS's] customers . . . the better" is one of SBS's reasons for maintaining secrecy (Compl. ¶ 12); it does not, viewed in the light most favorable to SBS, imply that SBS's customers are commonly known by its competitors.

Defendants' contention that SBS's pricing structure cannot support an ITSA claim is similarly unavailing at this stage of the litigation. Defendants are correct that SBS's prices, on their own, do not fulfill the secrecy criterion of the ITSA. *See Applied Indus. Materials Corp.* v. *Brantjes*, 891 F. Supp. 432, 438 (N.D. Ill. 1994) (Holderman, J.) ("[P]rice information which is disclosed by a business to any of its customers, unlike a unique formula used to calculate the price information which is not disclosed to a business's customers, does not constitute trade secret information protected by the [ITSA].") (citations omitted). But SBS alleges that Potts and Woodland have paired the price information they solicited from SBS's customers with Potts's knowledge of SBS charge codes. (Compl. ¶ 46.) SBS claims these codes, in conjunction with Potts's knowledge of SBS's pricing structure, have allowed Woodland to underbid SBS. (*Id.*) In its response to Defendants' motions to dismiss, SBS clarified that the codes help Potts "reverse engineer the confidential pricing formula that SBS" uses for a particular customer. (Pl.'s Resp. at 7.) Whether SBS's pricing structure is truly a confidential formula or merely a line item

summary of SBS's overall price is a question of fact which the court cannot resolve on a motion to dismiss. Drawing all inferences in favor of SBS, the Complaint alleges sufficient facts to show that SBS's confidential customer information, including information regarding its pricing structure, fulfills the secrecy criterion of the ITSA.

### ii. Reasonable Measures to Maintain Secrecy

Defendants argue SBS's ITSA claim also fails because the Complaint does not identify actions sufficient to maintain the secrecy of SBS's confidential customer information. (Woodland Mem. at 7; Potts Mem. at 9-10.) Defendants describe a number of precautions SBS declined to take, such as specially labeling secret information and executing confidentiality agreements with each employee. (Woodland Mem. at 7.) Under the ITSA, however, SBS need not take every imaginable precaution to protect its trade secrets. SBS's safeguards simply must be reasonable under the circumstances to maintain the secrecy of its information. 765 ILCS 1065/2(d).

SBS alleges it took "reasonable measures to maintain [the] . . . secrecy" of its confidential customer information, (*id.* ¶ 64), and the Complaint describes those reasonable measures in detail: SBS maintained a non-disclosure policy (*id.* ¶ 17)[1]; SBS kept its confidential customer information behind a password-protected intranet (*id.* ¶ 15); SBS limited its access to selective

---

[1]  Woodland argues SBS's failure to attach the policy to its Complaint suggests "that the policy is imprecise about what SBS considers secret." (Woodland Mem. at 7.) The court in ruling on a 12(b)(6) motion may consider any exhibits attached thereto. *Cole*, 634 F.3d at 903 (citing *Thompson* v. *Ill. Dep't of Prof'l Reg.*, 300 F.3d 750, 753 (7th Cir. 2002)). A plaintiff's failure to attach an exhibit does not, as Woodland claims, create a presumption that the well-pleaded facts in the Complaint are untrue.

employees (*id.*); and SBS utilized traditional security measures to protect physical documents (*id.*). These facts, viewed in the light most favorable to SBS, sufficiently allege that SBS took reasonable steps to maintain the secrecy of its confidential customer information. *See, e.g.*, *Mintel Intern. Grp., Ltd.*, 2010 WL 145786, at *11 (finding plaintiff had taken reasonable measures to maintain secrecy by limiting access to a select group of employees and requiring employees to sign non-disclosure agreements); *RKI, Inc.* v. *Grimes*, 177 F. Supp. 2d 859, 874-75 (N.D. Ill. 2001) (Denlow, J.) (finding plaintiff had taken reasonable measures to maintain secrecy by providing access on a "need-to-know" basis, keeping it on a password-protected computer database, and requiring employees to sign and acknowledge receipt of a non-disclosure policy).

    B.  <u>Misappropriation of Trade Secrets</u>

SBS must also allege facts showing that Woodland and Potts misappropriated its trade secrets. Under the ITSA, misappropriation occurs by improper acquisition, unauthorized disclosure, or unauthorized use. 765 ILCS 1065/2(b); *Lumenate Techs., LP* v. *Integrated Data Storage, LLC*, No. 13 C 3767, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013) (St. Eve, J.) (citing *Liebert Corp.*, 827 N.E.2d at 925). Misappropriation by improper acquisition entails acquisition by improper means, which the ITSA defines as "theft, bribery, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a). Misappropriation by unauthorized disclosure or unauthorized use requires a defendant to use the alleged trade secrets

or disclose them to others "for purposes other than serving the interests of" the owner of the trade secrets. *Lumenate Techs.*, 2013 WL 5974731, at *4 (citations omitted).

SBS sufficiently alleges that Potts and Woodland misappropriated its trade secrets. In its Complaint, SBS alleges Potts had access to SBS's trade secrets during his employment as a Business Development Executive (Compl. ¶ 26); Potts forwarded emails containing SBS's trade secrets to his personal email account (*id.* ¶ 28); he resigned from SBS on July 2, 2013 and immediately joined a competitor (*id.* ¶¶ 41-42); on June 15, 2013, less than 17 days before his resignation, Potts surreptitiously entered SBS's office on a weekend and removed documents containing SBS's trade secrets in violation of SBS policy (*id.* ¶¶ 33, 34); before resigning, Potts attempted to cover his tracks by deleting from his SBS email folder the emails he forwarded to his personal account (*id.* ¶ 40); and Potts used SBS's trade secrets to poach business from multiple SBS customers (*id.* ¶¶ 46, 57). Potts claims, contrary to the allegations in the Complaint, SBS did not have a policy prohibiting (1) forwarding emails to personal accounts or (2) removing documents from SBS's physical offices. (Dkt. No. 24 ("Potts Reply") at 2.) Potts also contends the emails and files he removed did not contain any trade secrets within the meaning of the ITSA, and that SBS's failure to attach to its Complaint any documents proving otherwise requires this court to dismiss SBS's claims. (Potts Mem. at 19.) All of Potts's arguments raise questions of fact this court cannot resolve on a motion to dismiss. At this stage, the court must accept as true SBS's allegations that Potts took documents containing trade secrets in violation of SBS policy, attempted to cover his tracks by erasing the evidence, and has

since used the information to poach business from SBS's former customers. These facts are sufficient to allege misappropriation under the ITSA.

SBS also alleges facts sufficient to show that Woodland misappropriated its trade secrets as well. First, SBS alleges that Woodland hired Potts only after he promised Woodland that he would use his knowledge of SBS's trade secrets to solicit SBS customers. (Compl. ¶ 44.) This agreement is sufficient to allege a misappropriation because it involves an acquisition of SBS's trade secrets by improper means. 765 ILCS 1065/2(a) ("[i]mproper means includes . . . inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use"). Second, SBS alleges Woodland used, and continues to use, SBS's trade secrets despite knowledge that the secrets were acquired by improper means. This too is a misappropriation under the ITSA. *See* 765 ILCS 1065/2(b)(2)(B)(I) ("[m]isappropriation means . . . (2) disclosure or use of a trade secret of a person without express or implied consent by another person who . . . at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was . . . (I) derived from or through a person who utilized improper means to acquire it").

Potts argues that no *quid pro quo* agreement between Woodland and Potts ever occurred. (Potts Mem. at 5.) This argument, like Potts's earlier arguments, requires this court to ignore its duty to accept as true all well-pleaded facts in the Complaint. Woodland, on the other hand, challenges the adequacy of SBS's allegation because it is based "upon information and belief," which Woodland contends does not satisfy the pleading standards under Fed. R. Civ. P. 11. (Woodland Mem. at 8.) Woodland relies on the Seventh Circuit's decision in *Bankers Trust Co.* v. *Old Republic Insurance Co.*, 959 F.2d 677 (7th Cir. 1992), which holds that allegations of

fraud require "reasonable precomplaint inquiry" and are not properly made on "information and belief." *Id.* at 684. But Woodland ignores the next sentence of *Bankers Trust*, which clarifies that pleading facts on "information and belief" is deficient "unless they were facts inaccessible to the plaintiff." *Id.* The Seventh Circuit has since held that "allegations . . . cannot be faulted for their reliance on 'information and belief' . . . [w]here pleadings concern matters peculiarly within the knowledge of defendants." *Brown* v. *Budz*, 398 F.3d 904, 914 (7th Cir. 2005). Although *Brown* predates *Twombly* and *Iqbal*, district courts in this circuit have concluded that nothing in either *Twombly* or *Iqbal* overrules the Seventh Circuit's holding in *Brown*. *See Shales* v. *Schroeder Asphalt Servs.*, No. 12 C 6987, 2013 WL 2242303, at *4 (N.D. Ill. May 21, 2013) (Kendall, J.) (finding allegations pled on "information and belief" are not categorically deficient); *Simonian* v. *Blistex*, No. 10 C 1201, 2010 WL 4539450, at *3 (N.D. Ill. Nov. 13, 2010) (St. Eve, J.) (determining pleading information on "information and belief" is not categorically improper, particularly when information lies uniquely within the control of defendant). Unless Potts used his SBS email account to negotiate the conditions of his employment with Woodland, SBS is unlikely to have access to the evidence supporting its allegation. Thus, as a practical matter, SBS must plead its allegations upon information and belief and is entitled to do so under Fed. R. Civ. P. 11.

SBS further alleges Woodland used and continues to use SBS's trade secrets to seek out and poach SBS's customers. (Compl. ¶¶ 45, 46, 55-59.) Specifically, Woodland has availed itself of Potts's tainted sales efforts despite notice from SBS that Potts's sales rely on SBS's stolen trade secrets. Although Woodland argues SBS lacks a good faith belief that Woodland received

or used any SBS information, (Woodland Mem. at 8), SBS's allegations support such an inference. SBS alleges that Potts stole its trade secrets, immediately began working for Woodland, and within two months poached SBS customers previously unknown to Woodland. These facts are sufficient to allege that (1) Woodland received and benefited from SBS's trade secrets and (2) knew or had reason to know that Potts had obtained the secrets through improper means. *See* 765 ILCS 1065/2(b)(1).

Accordingly, for the reasons set forth above, SBS's Complaint sufficiently alleges (1) the existence of one or more trade secrets and (2) misappropriation of those secrets. The court denies Defendants' motions to dismiss Count I of SBS's Complaint.

II.      SBS's Common Law Claims (Counts II, III, V, and VI)

To "supplement its claims under the ITSA," (Pl.'s Resp. at 5), SBS attempts to allege common law claims against Woodland and Potts, including tortious interference with business relations, unfair competition, and unjust enrichment against both Woodland and Potts (Compl. ¶¶ 69-76, 88-91). SBS asserts an additional claim, breach of duty of loyalty, against Potts. (Compl. ¶ 81-87.) Defendants contend the ITSA preempts all of SBS's common law claims. (Woodland Mem. at 10; Potts Mem. at 11.) The court agrees in part.

The ITSA "abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under the [ITSA] itself." *Hecny Transp. Inc.* v. *Chu*, 430 F.3d 402, 404 (7th Cir. 2005); *see also* 765 ILCS 1065/8(a) (The ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret."). In *Hecny*, however,

15

the Seventh Circuit narrowly construed the ITSA to foreclose only those claims that rest on conduct alleged to misappropriate trade secrets. *Hecny*, 430 F.3d at 404-05 ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record."); *see also RTC Indus., Inc.* v. *Haddon*, No. 06 C 5734, 2007 WL 2743583, at *3 (N.D. Ill. Sept. 10, 2007) (Grady, J.) (concluding *Hecny* departs from broad preemptive effect previously accorded to ITSA); *Dominion Nutrition, Inc.* v. *Cesca*, No. 04 C 4902, 2006 WL 560580, at *4 (N.D. Ill. Mar. 2, 2006) (Hart, J.) (noting *Hecny* "narrowly construed" the preemptive effect of the ITSA). After *Hecny*, the test is whether a plaintiff's claim would stand if the information at issue were not a trade secret. *Lumenate Techs.*, 2013 WL 5974731, at *7; *see also RTC Indus.,* 2007 WL 2743583, at *3 (holding claims that would lie if information were non-confidential are not preempted by ITSA).

SBS's claims of tortious interference with business relations, unfair competition, and unjust enrichment cannot survive this test. In an attempt to save its "supplemental" common law claims, SBS argues they "are not based exclusively on misappropriation of trade secrets, but also encompass Defendants' misappropriation and use of all of SBS's proprietary and confidential information." (Pl.'s Resp. at 6.) SBS's Complaint, however, draws no distinction between information it considers to be trade secrets and information that is merely "proprietary and confidential." According to the Complaint, SBS considers all of its "confidential customer information" to be "in the nature of trade secrets." (Compl. ¶ 9.) SBS cannot, for the first time in its response, divide its "confidential customer information" into two separate categories: one to

support its ITSA claim and another to support its "supplemental" common law claims. Alternatively, SBS contends the common law claims "are not based entirely on *conduct* that constitutes misappropriation of trade secrets under the ITSA." (Pl.'s Resp. at 5) (emphasis added). But SBS's Complaint fails to allege any conduct that would give rise to its claims if the information at issue were non-confidential. SBS alleges Defendants contacted its customers (Compl. ¶¶ 45, 46, 55); offered them a better price than SBS (*id.* ¶¶ 46, 57, 61); and claimed "that Woodland Global's products and services will be superior to SBS's [products and services]" (*id.* ¶ 61). Absent an improper advantage, such as the use of SBS's trade secrets, this conduct does not constitute tortious interference, unfair competition, or unjust enrichment—it is the hallmark of competition.

The ITSA does not, however, preempt SBS's claim that Potts breached his duty of loyalty to SBS. Under Illinois law, "an employee owes a duty of fidelity and loyalty to his employer." *V.I.M. Recyclers, L.P.* v. *Magner*, No. 03 C 0343, 2005 WL 1745657, at *12 (N.D. Ill. July 21, 2005) (Denlow, J.) (citations omitted). Absent a restrictive contractual provision, however, an employee "has a right to enter into competition with the former employer upon leaving such employ." *Classic Amenities, Inc.* v. *Verbeke*, No. 00 C 3326, 2003 WL 21801021, at *2 (N.D. Ill. Aug. 1, 2003) (Grady, J.) (quoting *Lawter Int'l, Inc.* v. *Carroll*, 451 N.E.2d 1338, 1349 (Ill. App. Ct. 1st Dist. 1983)). Thus, on its own, SBS's claim that Potts misappropriated its trade secrets is insufficient to survive the preemptive effect of the ITSA. The allegation rests solely on the conduct giving rise to the ITSA claim and would not survive if the information at issue was not confidential, because Potts has no duty to forego post-employment competition with SBS using

publicly-available information. But SBS also alleges that Potts, in anticipation of leaving SBS, intentionally undermined SBS's business by quoting prices to SBS customers that Potts knew would incur substantial losses. (Compl. ¶ 32.) SBS alleges Potts's actions served two goals: (1) to ingratiate himself with customers he would be shortly soliciting on behalf of Woodland and (2) to cause financial damage to SBS. (*Id.*) These actions, along with Potts's other conduct, are sufficient to state a claim for breach of fiduciary duty. *See, e.g.*, *Lumenate Techs.*, 2013 WL 5974731, at *9 (speaking disparagingly about employer to customers, engaging in a work slowdown, downloading employer's files onto external drives, and attempting to "cover tracks" constitutes breach of fiduciary duty not preempted by ITSA).

Accordingly, the court grants Defendants' motions to dismiss SBS's claims of tortious interference with business relations (Count II), unfair competition (Count III), and unjust enrichment (Count VI) because they are preempted by SBS's claim under the ITSA. The court denies Potts's motion to dismiss SBS's claim for breach of duty of loyalty (Count V) because the claim would stand even if SBS's various categories of confidential customer information were not trade secrets.

III.    SBS's Computer Fraud and Abuse Act Claim (Count IV)

Count IV alleges Potts intentionally—and without authorization—accessed SBS's computers, intranet, and email system and emailed SBS's confidential customer information to his personal email account. (Compl. ¶¶ 28-29, 39, 78.) SBS also alleges Potts attempted to conceal his theft by deleting the outgoing emails from his SBS email account. (*Id.* ¶ 40.) Notwithstanding Potts's attempt to cover his tracks, SBS does not allege it lost access to any

information as a result of Potts's conduct. SBS does, however, allege Potts's conduct caused a "loss" of at least $5,000, including costs related to damage assessment and mitigation.

To state a claim for a violation of the CFAA, a plaintiff must prove: "(1) damage or loss; (2) caused by; (3) a violation of one of the substantive provisions set forth in § 1030(a); and (4) conduct involving one of the factors in § 1030(c)(4)(A)(i)(I)-(V)." *Cassetica Software, Inc.* v. *Computer Scis. Corp.*, No. 09 C 0003, 2009 WL 1703015, at * 3 (N.D. Ill. June 18, 2009) (Kendell, J.). The "underlying concern of the [CFAA] is damage to data and . . . the statute was not meant to cover the disloyal employee who walks off with confidential information." *Del Monte Fresh Produce, N.A., Inc.* v. *Chiquita Brands Int'l*, 616 F. Supp. 2d 805, 813 (N.D. Ill. 2009) (Hibbler, J.) (quoting *Kluber Skahan & Assocs.*, No. 08 C 1529, 2009 WL 466812, *8 (N.D. Ill. Feb. 25, 2009) (Zagel, J.)) (internal quotations omitted).

Here, SBS does not—and cannot—claim Potts's conduct caused "damage" within the meaning of the CFAA, because SBS does not allege any data were lost or impaired. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Courts in this district have consistently interpreted "damage" under the CFAA to include "the destruction, corruption, or deletion of electronic files, the physical destruction of a hard drive, or any diminution in the completeness or usability of the data on a computer system." *See, e.g.*, *Farmers Ins. Exch.* v. *Auto Club Grp.*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (Holderman, J.) (collecting cases). By contrast, downloading and emailing trade secrets is not enough to satisfy the damage requirement of the CFAA. *Id.; see also Motorola* v. *Lemko Corp.*, 609 F. Supp. 2d 760, 769 (N.D. Ill. 2009) (Kennelly, J.) ("The only

harm [plaintiff] has alleged is the disclosure to a competitor of its trade secrets and other confidential information. The CFAA's definition of damage does not cover such harm . . . .")

Instead, SBS alleges it suffered a "loss" attributable in part to damage assessment and mitigation. (Compl. ¶ 79.) The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). District courts in this circuit have construed the term "loss" in different ways. *Compare Farmers Ins. Exch.*, 823 F. Supp. 2d at 854 ("[A] plaintiff can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA.") (citations omitted), *with Von Holdt* v. *A-1 Tool Corp.*, 714 F. Supp. 2d 863, 875-76 (N.D. Ill. 2010) (Manning, J.) (requiring "damage to the computer or computer system" before a plaintiff can prove "loss" under the CFAA). Courts generally agree, however, that "[c]osts not related to computer impairment or computer damages are not compensable under the CFAA." *Farmer Ins. Exch.*, 823 F. Supp. 2d at 855 (quoting *SKF USA, Inc.* v. *Bjerkness*, 636 F. Supp. 2d 696, 721 (N.D. Ill. 2009) (Pallmeyer, J.)) (additional citations omitted); *see also Cassetica Software*, 2009 WL 1703015, at *4 ("With respect to 'loss' under the FCAA, other courts have uniformly found that economic costs unrelated to computer systems do not fall within the statutory definition of the term."); *CustomGuide* v. *CareerBuilder, LLC*, 813 F. Supp. 2d 990, 998 (N.D. Ill. 2011) (Holderman, J.) (finding plaintiff failed to state a

CFAA claim by failing to allege "any facts connecting its purported 'loss' to an interruption of service of its computer systems").

Here, SBS fails to allege any facts connecting its purported loss to an interruption of service, loss of data, or even a suspected loss of service or data. Although SBS attributes certain losses to "damage assessment and mitigation," (Compl. ¶ 79), it is clear from the Complaint that SBS's "damage assessment" efforts were aimed at determining the scope of information Potts emailed to himself and disclosed to Woodland. (Compl. ¶¶ 50-52.) SBS does not allege it ever lost access to any of the information contained in Potts's emails, notwithstanding Potts's attempt to conceal his conduct by deleting the emails. (Compl. ¶ 40.) To be sure, assessing the extent of information illegally copied by an employee is a prudent business decision. But the cost of such an investigation is not "reasonably incurred in responding to an alleged CFAA offense," because the disclosure of trade secrets, unlike destruction of data, is not a CFAA offense. *Farmers Ins. Exch.*, 823 F. Supp. 2d at 854. Accordingly, the costs of investigating Potts's conduct are not "losses" compensable under the CFAA.

Because SBS's Complaint fails to allege any damage or loss within the definition of the CFAA, SBS's Complaint fails to state a violation of the CFAA. Potts's motion to dismiss Count IV is granted.

IV.    SBS's Request for Sanctions

SBS includes in its response to Defendants' motions to dismiss a request that this court impose sanctions on Woodland and Potts. (Pl.'s Resp. at 8-10.) SBS contends Defendants' motions mischaracterize the allegations in the Complaint and mislead this court on the law

applicable to SBS's claims. Fed. R. Civ. P. 11(c)(2) states that a motion for sanctions must be made separately from other motions—not simply included as an additional prayer for relief contained in another motion—and served as provided in Rule 5. Because SBS failed to comply with the requirements of Rule 11(c)(2), its motion for sanctions is denied.

## CONCLUSION

For the reasons explained in this memorandum opinion, the court rules as follows: Defendants' "Motion[s] to Dismiss" (Dkt. Nos. 12, 17) are denied as to Count I of plaintiff SBS's Complaint, because Count I sufficiently alleges a violation of the ITSA against both Defendants, and granted as to Counts II, III, and VI, which are preempted by the ITSA. Potts's "Motion to Dismiss" (Dkt. No. 17) is granted as to Count IV of SBS's Complaint, because SBS fails to state a claim under the CFAA, and denied as to Count V, because SBS's Complaint sufficiently alleges Potts breached his duty of loyalty to SBS. Defendants' answer to Count I and Potts's answer to Count V are due on or before 2/28/14. Counsel for the parties are requested to meet and confer pursuant to Rule 26(f). Counsel are also requested to file jointly a Form 52 on or before 3/7/14. This case is set for a report on a status and entry of a scheduling order on 3/11/14 at 9:00 a.m. The parties are encouraged to discuss settlement.


ENTER:

_James F. Holderman_
JAMES F. HOLDERMAN
District Judge, United States District Court

Date: February 7, 2013